

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MARK MAZER, et al.,

Defendants.

MEMORANDUM DECISION
AND ORDER

S2 11 Cr. 121 (GBD)

GEORGE B. DANIELS, United States District Judge:

On November 22, 2013, following a six-week jury trial, Mark Mazer and his uncle Dimitry

Aronshtein were convicted of all counts with which they had been charged by superseding

indictment.  The defendants were charged and convicted of fraud,[1] bribery, money laundering,

conspiracy, and other related charges in connection with a scheme to defraud the City of New York.

The defendants were hired by the City to work on the CityTime Project – a project to modernize the

payroll system for City employees.  On February 2, 2014, Aronshtein filed a motion for a judgment

of acquittal pursuant to Fed. R. Crim. P. 29, and a motion for a new trial pursuant to Fed. R. Crim.

P. 33.  ECF No. 324.  By letter, Mazer joined in Aronshtein's motions to the extent relevant to his

case.[2]  ECF No. 328.

In the portion of his moving papers seeking a judgment of acquittal, Aronshtein claims that

there was an absence of proof from which a reasonable jury could have concluded that: (1)

---

[1] Mazer was charged and convicted of wire fraud and wire fraud conspiracy, while Aronshtein was not charged with
either of these offenses.

[2] Co-defendant Gerard Denault, also convicted at trial with Aronshtein and Mazer, did not join in Aronshtein's motion
or file his own separate motion for judgment of acquittal or for a new trial.

Aronshtein made payments to Mazer with the intent to influence Mazer; (2) Aronshtein engaged in financial transactions with the intent to conceal the origin of the funds; and (3) Mazer was an agent of the City of New York.  In the Rule 33 portion of his motion papers, Aronshtein seeks a new trial on the basis that the jury's verdict was against the weight of the evidence.  Finally, Aronshtein seeks an evidentiary hearing based on the claim that a newly-discovered document demonstrates Government misconduct and trial perjury by cooperating witness Carl Bell.  Defendants' motions for a judgment of acquittal and for a new trial are DENIED.

## The Rule 29 Motion

"A defendant challenging the sufficiency of the evidence bears a very heavy burden." United States v. Kozeny, 667 F.3d 122, 139 (2d Cir. 2011).  In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government, "assuming that the jury resolved all questions of witness credibility and competing inferences in favor of the prosecution."  United States v. Abu-Jihaad, 630 F.3d 102, 134 (2d Cir. 2010).  The Court must analyze the pieces of evidence "in conjunction, not in isolation," United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).  The Court must also "credit[ ] every inference that the jury might have drawn in favor of the government." United States v. Temple, 447 F.3d at 136-37 (internal quotation marks and citation omitted).  "These standards apply whether the evidence being reviewed is direct or circumstantial." Persico, 645 F.3d at 105.

Under this standard, a jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 105 (internal citation omitted).  Accordingly, a "court may enter a judgment of acquittal only if the evidence" of guilt "is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."

United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks and citation omitted).  With respect to a conspiracy verdict, the deference accorded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks and citations omitted).

Furthermore, when a defendant testifies on his own behalf, as did Defendant Aronshtein, he loses "his right to have sufficiency assessed on the basis of the government's presentation alone." United States v. Tran, 519 F.3d 98, 105 (2d Cir. 2008) (citing United States v. Aulicino, 44 F.3d 1102, 1114 (2d Cir. 1995)).  As the Second Circuit described in Tran, the "jury is entitled to disbelieve the defendant's attempts at exculpatory explanation, [and] a testifying defendant might inadvertently add weight to the government's case" by placing his own credibility at issue.  Id. at 105-06 (internal citations and quotation marks omitted).  Further, a jury may consider the credibility of a defendant's explanation of his conduct as "a relevant factor in [its] determination" of a defendant's intent.  Id. at 106.

1. **Aronshtein's Corrupt Intent to Influence Mazer**

Aronshtein argues that there was insufficient evidence to support the jury's conclusion that he corruptly paid money to Mark Mazer with the intent to influence Mazer in connection with the CityTime project.  See Defs. Mem. at 3-10.  To the contrary, there was overwhelming evidence presented at trial from which a jury could conclude that Aronshtein corruptly intended to influence Mazer.

The evidence at trial established that prior to receiving more than $65 million in CityTime business, Aronshtein's company, DA Solutions, Inc. ("DAS"), had no clients or business and had no

office outside of his home.[3]  Further, the evidence also showed that over the course of DAS's nearly six years of work on the CityTime project, DAS did not obtain a single client other than the City, and CityTime business accounted for 99.5% of DAS's income from 2005 through 2010.  See GX8004-3.  Moreover, Aronshtein earned substantial profits on each consultant hired through DAS under the supervision of Mazer.  Over the course of the project, Aronshtein personally kept $5 million in CityTime profits for himself.

Further, the evidence showed that DAS earned an average of 122% on its consultants -- while several witnesses with experience in the industry testified that the typical profit margin for IT consultants was 15 to 30%.  See GX 8010-1; Tr. 1569, 1633, 2365.  The jury reasonably concluded from this evidence that Aronshtein paid Mazer, who was Aronshtein's connection to the CityTime project, in order to secure tens of millions of dollars in illegal business profits he otherwise would never have received.

In addition, the testimony of numerous witnesses, supported by contemporaneous emails and contract and employment documents, showed that Mazer got DAS hired onto the project and oversaw most of the consultants hired through DAS.  Furthermore, Mazer selected many of the consultants hired through DAS, directed that they be hired through DAS, and determined how much they would be paid.  See, e.g., GX 4001-275; Tr. 2902-03, 3022, 3289.  The trial evidence also showed that Aronshtein and Mazer tried to hide DAS's role in hiring consultants onto the project. See, e.g., Tr. 2153, 2158; GX 4020-34.  The jury reasonably concluded from this evidence that Mazer used his power on the project to get consultants hired through DAS.  Combined with the additional trial evidence noted infra, the jury further concluded that Mazer did so in exchange for millions of dollars in payments he received from Aronshtein.

---

[3] Aronshtein admitted in his testimony that DAS had no customers, clients or other business for more than a year before CityTime (Tr. 4562), and the bank records confirmed that DAS had no outside revenue for more than a year before CityTime (GX 8004-3).

The uncontroverted bank records and related summary charts at trial showed in great detail how money flowed from Aronshtein to Mazer and how they obscured the source of payments. Of the approximately $20 million in payments made by Aronshtein to Mazer, none could be traced directly. Rather, the payments were made to a series of shell companies, some of which Aronshtein helped set up, and through foreign wire transfers that ultimately were sent back to Mazer through other accounts. See GX 8008-5, 8002-1, 8004-5, 8008-2.

Additionally, the testimony of cooperating witness Victor Natanzon, which was extensively corroborated by contemporaneous records, established that Natanzon had entered into the same corrupt bargain with Mazer as had Aronshtein. Natanzon testified that Mazer steered nearly $23 million in CityTime business to Natanzon's consulting company, on the condition that Natanzon pay 80% of his profits on each consultant to Mazer. See Tr. 2356, 2377. Additional evidence demonstrated that Aronshtein's home computer contained spreadsheets reflecting the same 80/20 split on consultant profits that Mazer and Natanzon had agreed to. See GC 4001-251, 4001-287-E. The jury reasonably inferred that Aronshtein's arrangement with Mazer was essentially the same as Natanzon's – and that, like Natanzon, Aronshtein had the corrupt intent to pay money to Mazer in exchange for receiving business on CityTime.

Lastly, Aronshtein testified at trial and offered an illogical and unreasonable explanation concerning his millions of dollars of payments to Mazer. Aronshtein claimed that he paid Mazer not as illegal kickbacks in exchange for business on CityTime, but rather in connection with a "joint venture to 'productize' the CityTime program and market it to other cities, states, and countries." Defs. Mem. at 4. When confronted on cross-examination with the spreadsheet retrieved from his computer that depicted the 80/20 split with Mazer on consultant profits, Aronshtein claimed to have no knowledge of why he created the document. See Tr. 4632. Further, Aronshtein implausibly claimed not to recall why he had sent millions of dollars to the Mazer-controlled companies beyond

the amounts he claimed he sent for productization purposes. Id. at 4641-45. Aronshtein's self-serving testimony was inconsistent with the evidence at trial and rejected by the jury. Thus, there was considerable evidence at trial from which a jury could reasonably conclude that Aronshtein's unreasonable explanation on the witness stand was further evidence of his corrupt intent.

### 2. Financial Transactions

Aronshtein argues that the Government failed to prove that he conducted financial transactions with the intent to conceal the origin of the funds. However, the evidence on this issue at trial was more than sufficient to sustain the jury's verdict. As noted, the financial records showed that Aronshtein paid Mazer approximately $20 million during the course of the CityTime project. Notably, Aronshtein did not make any payments that were directly traceable to Mazer. Aronshtein routed more than $16 million in CityTime money through three shell corporations – MAS Solutions, Inc., SJM Services Inc., and Front Line Consulting, Inc. The jury reasonably concluded that these companies served no other purpose than to collect kickback payments from Aronshtein and Natanzon and then distribute the money among Mazer family members. See, e.g., GX 8003-2, 8003-3, 8003-4, 8003-5.

Furthermore, Aronshtein wired more than $3 million overseas, using wire transfer instructions that concealed the purpose of the transfers, and Mazer, in turn, received $2.9 million in overseas wires back to numerous U.S. bank accounts he controlled. See GX 8008-2, 8007-1. Aronshtein also withdrew more than $800,000 in cash, and the evidence showed that at the time of Mazer's arrest, Mazer had more than $1 million in cash stored in safe deposit boxes near his home. See GX 8004-5; Tr. 4312. Based on this evidence, and additional evidence presented at trial, the jury reasonably inferred that Aronshtein and Mazer used this web of shell accounts, overseas wires and cash transactions to conceal the "nature, the location, the source, the ownership, or the control"

of Aronshtein's financial transactions linked to Mazer.  18 U.S.C. § 1956(a)(1)(B)(i); see also

Superseding Indictment Count Twelve.

### 3.  Mazer's Status as an Agent of the City of New York

Aronshtein argues that "there was no evidence that [Mazer] was an agent of the monolithic

City of New York," and that even if Mazer was an agent of the City, the Government did not prove

that Aronshtein knew that Mazer was an agent.  See Defs. Mem. at 11-15.  Aronshtein's argument is

without merit.

In the first instance, there was overwhelming evidence presented at trial establishing that

Mazer served as an agent of the City of New York during the course of the CityTime project.

Numerous witnesses testified that Mazer effectively ran the CityTime project on behalf of the City.

For example, Office of Payroll Administration ("OPA") employee Lilia Ashjian testified that "Mark

[Mazer] was the head of the project on the city side."  Tr. 2551.

Moreover, the evidence also established that Mazer had control over tens of millions of

dollars in CityTime funds, that he had the power to hire and fire consultants on the project, and that

he signed off on employee timesheets as an "OPA Manager."  See, e.g., GX 303-15-C.  Further, the

evidence also showed that CityTime was a City-wide project, paid out of City-wide funds, and

developed for use at dozens of agencies across the City.  See, e.g., Tr. 3430-32.  Thus, there is no

merit to Aronshtein's argument that at most Mazer was an agent of OPA, and not the City itself.

See Defs. Mem. at 11-13.

Finally, there was plainly sufficient evidence for the jury to conclude that Aronshtein knew

that Mazer was an agent of the City.  On Aronshtein's cross-examination at trial, he testified that he

knew Mazer reported to Joel Bondy, who was the executive director of OPA, and that he knew

Mazer was one of the hiring managers on CityTime.  See Tr. 4612-14.  In addition, documents

recovered from Aronshtein's residence showed that Aronshtein treated Mazer as a hiring manager

on CityTime, instructing prospective candidates that Mazer would be the one interviewing them. See, e.g., GX 4001-255.  There was sufficient evidence that Mazer was an agent of the City and that Aronshtein knew that Mazer was an agent of the City.

**The Rule 33 Motion**

Aronshtein's Rule 33 motion essentially reargues the same claims concerning the strength of the evidence against him that he makes in the context of his Rule 29 motion.  In his Rule 33 motion, however, he claims that the verdict was "against the weight of the evidence," and that the Court should credit Aronshtein's account of his dealings with Mazer and discredit the substantial evidence presented at trial of his guilt.  Defs. Mem. at 15-19.

Rule 33 of the Federal Rules of Criminal Procedure provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The decision to grant a motion for a new trial is "firmly within the discretion of the trial judge."  United States v. Tarantino, 2012 WL 5430865, at *2 (E.D.N.Y. Nov. 7, 2012); see also United States v. Stewart, 433 F.3d 273 (2d Cir. 2006) (reviewing the trial court's denial of a Rule 33 motion for abuse of discretion).

The Second Circuit has cautioned, however, that "motions for a new trial are disfavored," United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995), and district courts should grant Rule 33 relief "sparingly and in the most extraordinary circumstances."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001); accord United States v. Padilla, 511 F. App'x 8 (2d Cir. 2013).  Thus, a motion for a new trial should not be granted unless, after evaluating "the entire record of the trial," the district court is left with a "real concern that an innocent person may have been convicted" and

"letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 134; accord

United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005).[4]

For the reasons set forth above, the Government's proof of Aronshtein's and Mazer's guilt

was overwhelming.  It featured testimony from employees of SAIC and the City; cooperating

witnesses who were co-conspirators in some of the charged conduct; paper and electronic evidence

obtained from various sources, including Aronshtein's home; voluminous financial records which

were presented in dozens of summary charts with supporting backup; and testimony from other

witnesses who helped establish the defendants' criminal intent.  All of these sources of evidence

corroborated each other and constituted both direct and circumstantial evidence of Aronshtein's and

Mazer's guilt.  Added to that overwhelming proof was Aronshtein's implausible testimony

concerning numerous material facts as set forth above.  Accordingly, the Rule 33 motion is denied.

## Newly Discovered Document

In less than a page of argument, Aronshtein claims that he is entitled to a hearing based on

his discovery of a document that purportedly impeaches the testimony of trial witness Carl Bell.

See Defs. Mem. at 18.  In part of his testimony, Bell testified to a series of conversations and events

that allegedly occurred at a holiday party in December, 2005.  Tr. 1166, 1472-1473.  Aronshtein

argues that given the incredibility of Bell's testimony at trial, "it is reasonable to infer that the event

itself never occurred."  Id.  Defendant's conclusion is inconsistent with the document he relies on,

which states, "OPA's Annual Holiday Party has been *rescheduled* to Thursday January 12, 2006!!!"

Defs. Mem. at Exhibit A (emphasis added).  Nevertheless, even if the document could somehow

support Defendant's theory that the OPA party did not happen and Bell testified falsely on this point

at trial, Defendant would still not be entitled to a new trial.

---

[4] It should be noted that each of the three defendants were ably represented by a team of experienced and distinguished counsel of exceptional ability and reputation.  The defendants could not have had a more thoroughly prepared and skillfully presented defense.

When a defendant moves for a new trial on the basis of "newly discovered evidence," the defendant must satisfy the following criteria:

> (1) the evidence must, indeed, be newly discovered, *i.e.*, discovered after trial; (2) the evidence must be such that it could not, with due diligence, have been discovered prior to or during trial; (3) the evidence must be material to the issue of guilt, and not merely for the purpose of impeaching other testimony; (4) the evidence must not be cumulative; and (5) the evidence must be such that it would probably lead to acquittal. United States v. Cruz, 602 F. Supp. 825, 828-29 (S.D.N.Y. 1985).

Courts have repeatedly denied motions for new trials where the defendant fails to satisfy even one of these elements. See United States v. Garcia, 99 CR. 258 (LAP), 2003 WL 21650106 (S.D.N.Y. July 14, 2003) ("[T]he defendant must satisfy all elements of a five-prong test"); see also United States v. Salameh, 54 F. Supp. 2d 236, 284 (S.D.N.Y. 1999) aff'd, 16 F. App'x 73 (2d Cir. 2001) (finding a motion for a new trial "must fail because it cannot even satisfy the first element of a newly discovered evidence claim.").

In the first instance, the document was produced to the defense prior to trial. This Circuit has held that in order to warrant a new trial, a defendant must establish that his claim rests on evidence that the defense did not know of at the time of trial and "could not with due diligence have . . . discovered before or during trial." White, 972 F.2d at 20; accord United States v. Torres, 128 F.3d 38, 49 (2d Cir. 1997). "Due diligence has not been exercised if the defendant or his counsel could have, without unusual effort, acquired the evidence before or during the trial." United States v. DiMattina, 885 F. Supp. 2d 572, 577-78 (E.D.N.Y. 2012) ("There is an obligation to explore all matters that could be at issue at trial before trial's end."). Here, Aronshtein admits that the document was produced in discovery to all defendants prior to trial. See Defs. Mem. at 18. Therefore, the defense could, with due diligence, have discovered this document before and utilized it during the trial.

Furthermore, the document is only relevant, if at all, as impeachment evidence. However, a defendant cannot seek a new trial based on the discovery of new impeachment evidence when it

"merely furnishes an additional basis on which to impeach a witness" whose credibility already was attacked extensively at trial. United States v. Spinelli, 551 F.3d 159, 165 (2d Cir. 2008) (internal citations and quotation marks omitted). The Second Circuit has repeatedly found that such evidence is merely "cumulative." United States v. Damblu, 134 F.3d 490, 494 (2d Cir. 1998).

Here, the Government's cooperating witness was thoroughly impeached at trial. Bell's credibility was attacked on numerous grounds, including by contrasting his testimony concerning the date on which he recalled first hearing about Aronshtein from co-conspirator Reddy Allen with the date on which Aronshtein first began working with Reddy Allen, and by highlighting Bell's prior false testimony in divorce proceedings concerning the source of his earnings from India. There is no basis to conclude that, had Bell's credibility concerning the specific date of the holiday party come under attack as well, the jury's verdict would have been different. See White, 972 F.2d at 20 (denying a motion based on "newly discovered evidence" because the witness was "aggressively cross-examined by the defendant's lawyer, who relentlessly attacked [his] credibility."). Accordingly, the motion for an evidentiary hearing or other relief based on the allegedly newly-discovered document is denied.

## Conclusion

Defendants' motions for a judgment of acquittal and for a new trial are DENIED.

Dated:   April 17, 2014
        New York, New York

SO ORDERED

GEORGE B. DANIELS
United States District Judge

11